Calvin BUARI, Petitioner,

v.

Robert KIRKPATRICK, Superintendent, Wende Correctional Facility, Respondent.

No. 09 Civ. 9516 (VM).

United States District Court, S.D. New York.

Nov. 17, 2010.

Robert J. Boyle, Law Office of Robert J. Boyle, New York, NY, for Petitioner.

Rither Alabre, Bronx District Attorney Office, Bronx, NY, for Respondent.

### DECISION AND ORDER

VICTOR MARRERO, District Judge.

Petitioner Calvin Buari ("Buari"), currently incarcerated at Wende Correctional Facility in New York ("Wende"), brings this petition (the "Petition") seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254 against Robert Kirkpatrick, the superintendent of Wende ("Respondent").

In 1995, Buari was convicted in New York Supreme Court, Bronx County (the "Trial Court"), of two counts of murder in the second degree, in violation of New York Penal Law ("NYPL") § 125.25(1). Buari was sentenced to two consecutive indefinite prison terms of twenty-five years to life. In 2003, Buari moved pursuant to New York Criminal Procedure Law ("CPL") § 440.10 to vacate the judgment. Following a hearing, the Supreme Court, Bronx County (the "Motion Court") denied Buari's motion. On direct appeal, the Appellate Division, First Department ("Appellate Division") (together with the Motion Court, the "State Courts") unanimously affirmed the Motion Court's decision.

In his Petition, Buari asserts several federal constitutional claims as grounds for habeas relief. First, Buari argues that he was denied his right to a fair and impartial jury when, prior to sentencing, the sentencing court ("Sentencing Court") unreasonably failed to permit an inquiry concerning whether a juror had concealed his familial relationship with the Petitioner in order to serve on the jury, and further that he was denied due process of law when the Motion Court declined to hold a post-judgment hearing on that issue over seven years later. Second, Buari contends that he was denied due process of law when the Motion Court refused to grant him a new trial based upon the post-judgment confession of one prosecution witness

and the recantation of another. Third, Buari argues that the false testimony of a third prosecution witness, and the prosecution's failure to correct that witness's testimony, mandates that a new trial be ordered. Finally, Buari argues that the cumulative effect of the errors alleged above denied him a fair trial and due process of law.

For the reasons discussed below, the Court DENIES Buari's Petition.

## I. BACKGROUND[1]

### A. FACTS

Buari's conviction arises out of the murder of brothers Elijah and Salhaddin Harris (the "Harris Brothers") on the evening of September 10, 1992. The Harris Brothers were shot and killed while they sat in their car parked near the intersection of East 213th Street and Bronxwood Avenue in the Bronx, New York. At or near the scene at the time of the shooting were Buari, as well as John Parris ("Parris"), Kintu Effort ("Effort"), Kenya Holder ("Holder"), Jerry Connor ("Connor"), Clarence Seabrook ("Seabrook"), Brian Johnson ("Johnson"), Dwight Robinson ("Robinson" or "Dwight Robinson") and his brother Peter Robinson ("Peter Robinson"). All of these individuals knew each other, and Effort, Seabrook, Johnson and Dwight Robinson all sold drugs in the vicinity, with Dwight Robinson working for

---

1. The factual and procedural summary below is derived from the following documents: the Petition, dated November 16, 2009; Petitioner's Memorandum of Law in Support of Petition for Habeas Corpus ("Pet.'s Mem."), dated April 26, 2010; Respondent's Declaration In Opposition To Petition For Habeas Corpus ("Resp't's Decl."), dated September 28, 2010, and exhibits thereto; Respondent's Memorandum of Law in opposition to the Petition, dated September 2010 ("Resp't's Opp."); Petitioner's Reply Memorandum, dated Novem-

ber 1, 2010 ("Pet.'s Reply"); the transcript of sentencing, dated December 5, 1993[sic], in *People v. Buari*, N.Y. Sup.Ct. Ind. No. 2111/93 ("S. Tr."); the decision of the Motion Court in *People v. Buari*, 11 Misc.3d 1077(A), 2006 WL 940640 (N.Y.Sup.Ct. Apr. 10, 2006); and the decision of the Appellate Division in *People v. Buari*, 50 A.D.3d 483, 856 N.Y.S.2d 81 (N.Y.App. Div. 1st Dep't 2008). Except where specifically referenced, no further citation to these sources will be made.

Buari. With the exception of Parris, all of these individuals witnessed the incident.

Buari was subsequently arrested in March 2003, charged with the murders based on an eyewitness account, and released on bail. After Buari's release, he telephoned Dwight Robinson and told him to tell Buari's attorney that, when the shooting occurred, Robinson and other witnesses observed a brown car circle the block while Buari merely sat nearby. This request was made to Effort, Connor, Seabrook and Peter Robinson, as well, and all five men complied. However, after a series of shootings in the vicinity in 1995, including ones in which Buari, Parris, Peter Robinson and Seabrook's brother were all victims, and in which Peter Robinson and Seabrook's brother were killed, Dwight Robinson informed the police that he, Connor, and Seabrook witnessed Buari shoot the Harris Brothers. At trial, Dwight Robinson, Effort, Connor, Seabrook, Johnson, and Holder all testified to witnessing Buari commit the murders.

## B. PROCEDURAL HISTORY

### 1. The Trial and Sentencing

Buari was convicted by a jury on December 5, 1995 of two counts of murder in the second degree (NYPL § 125.25(1)). At trial, during defense counsel's cross-examination of Connor, Connor testified that he was once arrested for marijuana possession, which charge was later dis-

missed, and once received a ticket for drug possession. At the time of Connor's testimony, the prosecution was unable to locate Connor's state criminal case file, but it disclosed Connor's date of birth and Social Security number and informed Buari that Connor had no criminal convictions. The prosecution subsequently produced Connor's rap sheet, and Buari did not re-call Connor as a witness.

After Buari's conviction, but before sentencing, Buari's trial counsel, Kenneth Schreiber ("Schreiber"), requested an adjournment from the Sentencing Court, stating that he had been informed, post-verdict, by two of Buari's family members, that juror Thomas Jeffrey ("Jeffrey") was related to Buari through Jeffrey's estranged wife. Schreiber requested additional time in order to determine whether a motion to set aside the verdict for juror bias under CPL § 330.30 (a "§ 330 Motion") should be filed. In support of his request, Schreiber stated that Jeffrey had informed a defense investigator that he was unaware of his relationship with Buari until after trial.[2] Nevertheless, Schreiber sought additional time in order to determine whether Jeffrey, who was characterized as having a hostile relationship with his wife, had actually been aware of the relationship during the trial, dishonestly concealed it and harbored animus toward Buari.[3] The Sentencing Court denied Bu-

---

**2.** During voir dire, Jeffrey indicated that he had never seen or heard of Buari.

**3.** The parties disagree about what applications Schreiber made to the Sentencing Court, and, in particular, whether Schreiber requested that the Sentencing Court hold an evidentiary hearing to determine whether Jeffrey acted improperly. While the transcript from Buari's sentencing is somewhat ambiguous, consideration of the context in which Schreiber's requests were made suggests that the central goal of Schreiber's application to

the Sentencing Court was an adjournment rather than a hearing. Schreiber argued that he lacked sufficient evidence to bring a § 330 Motion to vacate, but that a question had been raised regarding possible juror misconduct, which he should be permitted to investigate before the sentencing. (See, e.g., S. Tr. at 3 ("I did not formally make a 330.30 motion at this time because the material I've received thus far hasn't put me in a position to do it, and that's the reason I'm asking for an adjournment."); S. Tr. at 9–10 ("I'm not saying that based on [the defense investigator's] affi-

ari's request for an adjournment, and noted that Buari had preserved his objection for purposes of a post-conviction motion. It then sentenced Buari to two consecutive indeterminate terms of imprisonment of twenty-five years to life.

## 2. *The CPL § 440 Motion*

On November 14, 2003, more than seven years after the Sentencing Court denied Buari's request for a pre-sentencing adjournment, Buari, through counsel, filed a motion pursuant to CPL § 440.10 (the "§ 440 Motion") to vacate his conviction. Buari blamed the long delay on his inability to obtain appointed appellate counsel until 2002.

Buari asserted three claims in his § 440 Motion. First, he argued that the Sentencing Court erred in failing to conduct a hearing regarding whether Jeffrey deliberately concealed his familial relationship with Buari. As Jeffrey had passed away in 2001, Buari contended that the error could not be rectified, and that, therefore, the verdict must be vacated. In support of this claim, Buari submitted affidavits from: himself, stating that he was unaware of his relationship with Jeffrey until after trial; his mother and aunt, stating that their father is the brother of Jeffrey's estranged wife, that Buari lived in Jeffrey's home for a year from age four to five (*i.e.,* twenty-five years earlier), and that they noticed Jeffrey on the jury during the trial and informed Schreiber; Schreiber, whose testimony contradicted Buari's mother's and aunt's testimony, in that Schreiber stated that he was not informed of the relationship between Jeffrey and Buari until after the verdict, one week before sentencing;[4] and a defense investigator who interviewed Jeffrey after the verdict, and who stated that Jeffrey had informed the investigator that Jeffrey was unaware during the trial of his relationship with Buari.

Second, Buari argued in his § 440 Motion that the prosecution failed to disclose that Connor's marijuana "ticket" had been converted into a pending criminal charge, allowed Connor to perjure himself about the matter, and then knowingly relied on Connor's perjured testimony during summation when it stated to the jury that Connor had no criminal convictions or criminal record of any kind.

Finally, Buari argued that newly discovered evidence demonstrated that Dwight Robinson, rather than Buari, had murdered the Harris Brothers (the "New Evidence Claim"). The "new evidence" to which Buari pointed included Robinson's

---

davit there's enough to set aside the verdict. I'm saying based on this affidavit there's enough to look into it to see if there is enough.... All I had at my fingertips was hearsay saying nothing improper happened.").) That said, Schreiber did indeed raise the possibility of a "judicial inquiry," (S. Tr. 8) and argued "[a]ll I'm saying, Judge, is give me the opportunity to get [Jeffrey] here to find out [whether any impropriety occurred]." (S. Tr. 11–12.) But this proposal ultimately appears to have been phrased as a possible alternative, in the event the Sentencing Court saw fit to do so for expediency, and was never rendered in the form of a formal application. (*See* S. Tr. at 12–13 ("If I find something that I think is appropriate to look into, then I ask the Court [to set aside the verdict]. If we want to shortcut all that, we can bring Mr. Jeffries [sic] in and ask him some questions.").) Nevertheless, for the purposes of the instant Petition, the Court will assume for the sake of argument that Schreiber did request that the Sentencing Court hold a hearing to investigate whether there was any basis for a claim of juror impropriety.

4. Schreiber also affirmed to the Sentencing Court that a member of Buari's family informed him about the relationship one week prior to sentencing, and that that family member had become aware of the relationship only "[a]fter the verdict. Sometime approximately eight or nine days" prior to the sentencing. (S. Tr. at 5.)

conviction for a murder committed in 1997 in a similar fashion and at the same location as the murders of the Harris Brothers, and supplemental affidavits from Robinson and Effort filed by Buari. In his affidavit, Robinson recanted his trial testimony incriminating Buari and swore that he, not Buari, had committed the murders for which Buari was convicted. Robinson also stated that he lied at trial because, at the time, he had been involved in a dispute with Buari over drug turf. Similarly, Effort also recanted his trial testimony, and swore that neither he nor Buari were involved in the murders. Effort blamed his false testimony at trial on his fear that, if he refused to testify against Buari, he himself might be charged with the murders.

### 3. The CPL § 440.10 Decision

The Motion Court rejected Buari's first and second claims outright, and held a series of hearings on Buari's New Evidence Claim. With regard to Buari's juror bias claim, the Motion Court found that (1) because neither Buari nor Jeffrey was aware of their relationship during trial, there was no factual basis for the claim of prejudice; (2) the Sentencing Court did not abuse its discretion in denying Buari's request for an adjournment, preserving the objection, and instructing Buari to file a CPL § 440.10 motion post-sentencing; and (3) because Buari failed to file his § 440 Motion in the six years post-verdict during which Jeffrey was alive, he was not entitled to a new trial.

With respect to Buari's second claim, involving Connor's alleged perjury, the Motion Court found that Connor had received an Adjournment in Contemplation of Dismissal with respect to one marijuana charge more than six months prior to

his testimony, which charge was therefore dismissed. It also found that Connor was unaware when he testified that a separate desk appearance ticket for marijuana possession was then still pending, since he had not yet been arraigned on the charge. Therefore, the Motion Court concluded, Connor's testimony that he had one dismissed marijuana possession case and had received a ticket for a separate occasion was completely truthful. Further, the Motion Court found that even if the prosecution had failed to disclose some information regarding Connor's criminal background, there was no reasonable possibility that a different verdict would have resulted.

Finally, the Motion Court held two hearings with respect to Buari's New Evidence Claim. Among the witnesses presented, Effort testified that Robinson, not Buari, committed the murders; and Kenneth Smith ("Smith"), Buari's former cellmate, testified that Robinson confessed to Smith that he had committed murders for which a friend of his had been convicted. For his part, Robinson, who was then serving twenty-five years to life for an unrelated murder, contradicted his affidavit confession. Instead, he testified that his trial testimony had been true, that it was Buari who killed the Harris Brothers, and that Robinson falsely confessed in the affidavit because Buari had threatened to kill him and harm his family if he refused.[5] Based on the testimony elicited at the hearings, the Motion Court found that both Robinson and Effort had testified truthfully at trial and that it was Buari who shot and killed the Harris Brothers. The Motion Court also found that Robinson had been threatened and coerced by Buari to recant his trial testimony, and that the testimony of Effort and Smith was incredible "for a

---

**5.** By the time he testified before the Motion Court, Robinson had already signed a second

affidavit recanting his confession and reaffirming his trial testimony.

virtual cornucopia of reasons." *Buari*, 2006 WL 940640, at \*23. Consequently, the Motion Court denied Buari's motion to vacate the judgment on new evidence grounds.

### 4. *The Appellate Division*

On direct appeal, the Appellate Division affirmed the Motion Court's decision with respect to Buari's § 440 Motion claims in its entirety. The court held that the Sentencing Court properly declined to adjourn the sentencing since Buari's claim of misconduct was speculative, and the only information before the Sentencing Court specifically contradicted it. The Appellate Division also noted that the Sentencing Court had invited Buari to raise the issue in a CPL § 440 motion, but that Buari did not do so until many years later, after Jeffrey had died. Consequently, the Appellate Division found that Buari was entirely responsible for the prejudice he claimed to face due to Jeffrey's unavailability. Further, the Appellate Division found that the Motion Court properly denied Buari's § 440 Motion with respect to this issue given the evidence that Buari's mother and aunt informed Schreiber about Buari's relationship with Jeffrey during the trial, rather than after the verdict.

Next, the Appellate Division held that the Motion Court properly denied Buari's New Evidence Claim, finding no basis to disturb the Motion Court's credibility determinations. Specifically, the Appellate Division found that the "alleged new evidence, consisting essentially of unreliable recantations and confessions that were themselves recanted, and extremely remote evidence of third party-culpability, did not justify vacating the judgment." *Buari*, 50 A.D.3d at 484, 856 N.Y.S.2d 81. This was particularly the case where "the hearing evidence support[ed] the conclusion that [Buari] coerced one of the People's witnesses into confessing to the crimes of which [Buari] was convicted."

*Id.* Finally, the Appellate Division held that, while the prosecutor failed to disclose the pending marijuana charge against Connor, and failed to correct Connor's mistaken trial testimony that the charge had been dismissed, there was no reasonable possibility that the nondisclosure affected the verdict. Hence, the Appellate Division found that the Motion Court had properly denied Buari's claim.

On August 18, 2008, 11 N.Y.3d 735, 864 N.Y.S.2d 393, 894 N.E.2d 657 (2008), the New York Court of Appeals denied Buari's application for leave to appeal.

### 5. *The Petition*

Buari filed his Petition on November 16, 2009, the day on which the statute of limitations for his Petition was to expire. Buari's Petition substantially tracks the claims he made before the Motion Court and the Appellate Division. First, he argues that he was denied his right to a fair and impartial jury when the Sentencing Court unreasonably declined to conduct a hearing concerning allegations of Jeffrey's bias, and that later he was denied due process of law when the Motion Court failed to conduct a hearing on that issue. Second, Buari argues that the State Courts' refusal to grant him a new trial based on the Robinson's confession and Effort's recantation denied him due process of law. Third, he argues that Connor's false testimony, which was not corrected by the prosecutor, mandates that he be granted a new trial. Finally, he argues that the cumulative effect of these errors denied him a fair trial and due process of law.

## II. *DISCUSSION*

### A. *LEGAL STANDARD FOR HABEAS RELIEF*

#### 1. *Exhaustion*

■ A petitioner in custody pursuant to a judgment of a state trial court is entitled

to federal habeas relief only if he has exhausted all available state court remedies. *See* 28 U.S.C. § 2254(b)-(c). This standard generally requires that the petitioner "fairly present" his claims to the highest available state court, setting forth all the factual and legal allegations he asserts in his federal petition. *See Dorsey v. Kelly,* 112 F.3d 50, 52 (2d Cir.1997) (*quoting Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)).

### 2. *Independent and Adequate State Grounds*

■ A federal court's authority to review a habeas petition also depends on whether the state court adjudicated the petitioner's claims on the merits or on state procedural grounds. *See Coleman v. Thompson,* 501 U.S. 722, 729–30, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). A claim resolved on independent and adequate state procedural grounds is generally not subject to habeas review. *See id.* A claim resolved in state court on the merits, however, may be subject to habeas review. A state court resolves a claim on the merits when it reduces its disposition to a final judgment with res judicata effect on substantive rather than procedural grounds. *See Sellan v. Kuhlman,* 261 F.3d 303, 311–12 (2d Cir.2001); *see also Castillo v. Walsh,* 443 F.Supp.2d 557, 562 (S.D.N.Y. 2006).

Federal habeas review of state court decisions is governed by the standard set forth in the Anti–Terrorism and Effective Death Penalty Act of 1996, 28 U.S.C. §§ 2241–55 ("AEDPA"). The AEDPA provides,

[a] district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a). Accordingly, a petitioner must demonstrate that his state court conviction violated federal law. *See Di Guglielmo v. Smith,* 366 F.3d 130, 136–37 (2d Cir.2004) (*citing Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)).

### 3. *Substantive Grounds for Federal Habeas Relief*

Not every alleged violation of federal law, however, will warrant the issuance of a writ of habeas corpus. *See Thurman v. Allard,* No. 01 Civ. 8746, 2004 WL 2101911, at *11 (S.D.N.Y. Sept. 22, 2004). Where a state court has decided a petitioner's federal claims on the merits, a court may grant habeas relief only if the state court's decision either:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

■ For the purposes of federal habeas review, "clearly established federal law" refers to the holdings, as opposed to dicta, of Supreme Court decisions in effect at the time of the relevant state court decision. *See Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court decision is "contrary to clearly established federal law" within the meaning of § 2254(d) if a state court decision contradicts relevant Supreme Court precedent or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives

at a result different from the Supreme Court." *Id.* at 405–06, 120 S.Ct. 1495. Under this standard, as long as the state court decision applies the correct legal rule to the petitioner's facts, it is not subject to habeas review, even if the federal court would have reached a different conclusion if it were to apply the rule itself. *See id.* at 406, 120 S.Ct. 1495.

██ A state court decision is based on an "unreasonable application of clearly established federal law" if the court correctly identifies the legal rule set forth in governing Supreme Court cases, but unreasonably applies the rule to the particular facts of the case. *See id.* at 412–13, 120 S.Ct. 1495. A federal court may grant habeas relief only where the state court decision, as it pertains to any issue of federal law, was objectively unreasonable in light of relevant precedent. *See id.* at 409, 120 S.Ct. 1495. In construing and applying federal law, even erroneous state court decisions, if deemed reasonable, will survive habeas review. *See id.* at 411, 120 S.Ct. 1495. However, the state court decision need not be "so off the mark as to suggest judicial incompetence" before habeas relief may be granted. *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir.2000) (internal quotation marks omitted). Thus, an unreasonable application "falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'" *Jones v. Stinson*, 229 F.3d 112, 119 (2d Cir.2000) (*quoting Francis S.*, 221 F.3d 100 at 109).

B. *APPLICATION*

1. *Exhaustion of State Remedies and Final Judgment on the Merits*

Buari unsuccessfully appealed his conviction to the Appellate Division, and the New York Court of Appeals denied leave to appeal. He also unsuccessfully moved for post-conviction relief under CPL § 440.10. Accordingly, neither Buari nor

Respondent disputes that Buari has exhausted all available state remedies and that there was a final judgment on the merits. Therefore, the Court must address only the question of whether the state courts' decisions were "contrary to" or "an unreasonable application of" clearly established federal law or resulted in a decision "based on an unreasonable determination of the facts." *See* 28 U.S.C. § 2254(d).

2. *Juror Bias*

██ The Supreme Court has held that a defendant has a right to "a fair trial by a panel of impartial, indifferent jurors." *See Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (internal quotation marks omitted). Where allegations of juror partiality arise after the verdict, the trial court should hold a hearing to determine whether actual bias existed, and if so, whether the defendant was prejudiced such that a new trial is warranted. *See Smith v. Phillips*, 455 U.S. 209, 215, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). However, courts are reluctant to "haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences." *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir.1989) (internal quotation marks omitted). Indeed, evidentiary hearings regarding claims of juror misconduct are an "extraordinary remedy," *Watson v. Artuz*, No. 99 Civ. 1364, 1999 WL 1075973, at *6 (S.D.N.Y. Nov. 30, 1999), required only when "there is clear, strong, substantial and incontrovertible evidence ... that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant." *Williams v. Artus*, 691 F.Supp.2d 515, 526 (S.D.N.Y.2010) (*quoting United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir.1983)); *see also Ianniello*, 866 F.2d at 543 ("[T]he

duty to investigate arises only when the party alleging misconduct makes an adequate showing of extrinsic influence to overcome the presumption of jury impartiality."). Moreover, the "[t]rial judge is accorded broad discretion in treating charges of jury misconduct." *United States v. Sattar*, 395 F.Supp.2d 66, 73 (S.D.N.Y.2005) (*citing Wheel v. Robinson*, 34 F.3d 60, 65 (2d Cir.1994)).

█ Here, Buari has not shown that that the State Courts' rejection of his juror bias claim was contrary to, or an unreasonable application of, this standard. As an initial matter, Buari never formally filed a § 330 Motion before the Sentencing Court alleging that juror Jeffrey was biased or that the verdict should be set aside. At most, Buari's trial counsel, Schreiber, proposed that the Sentencing Court hold a hearing to determine whether there *might* be a basis to make such a motion. *See* n. 2, above. Thus, it is debatable whether Buari can claim to have made any allegation of misconduct at all.

█ Further, even if Buari had made a formal allegation that Jeffrey acted improperly, the Court must defer to the State Courts' findings that there was no factual basis for Buari's claims of misconduct or prejudice, let alone "clear, strong, substantial and incontrovertible evidence ... that a specific, nonspeculative impropriety has occurred." *Artus*, 691 F.Supp.2d at 526 (*quoting Moon*, 718 F.2d at 1234). In general, any determination of a factual issue made by a state court is presumed to be correct, and a habeas applicant has the burden of rebutting this presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). More specifically, "a state trial court's conclusion that a juror is capable of rendering an impartial verdict is a factual determination that may 'be overturned only for manifest error.'" *Agosto v. Senkowski*, No. 99 Civ. 9013, 2004 WL 1814020, at *11 (S.D.N.Y. Aug. 16, 2004) (*quoting Patton v. Yount*, 467 U.S. 1025, 1031, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984)). Thus, the State Courts' findings that Jeffrey testified truthfully during voir dire must be presumed correct. Buari has made no showing whatsoever to rebut that presumption.[6]

In fact, the only evidence before the Sentencing Court was that neither Jeffrey nor Buari were aware of their relationship during the trial and that no improprieties had occurred. *See Buari*, 50 A.D.3d at 484, 856 N.Y.S.2d 81 ("Defendant's claim of misconduct was speculative, and the only information before the sentencing court specifically contradicted it."). Presented with these facts, the Sentencing Court's decision to proceed with sentencing while preserving Buari's objection for a potential motion under CPL § 440.10 at some point in the future was neither contrary to, nor an unreasonable application of, established law. Indeed, "[p]reservation of the opportunity to prove actual bias is a guarantee of a defendant's right to an impartial jury." *Smith*, 455 U.S. at 216, 102 S.Ct. 940 (*quoting Dennis v. United States*, 339 U.S. 162 at 171–72, 70 S.Ct. 519, 94 L.Ed. 734 (1950)).

Further, while the Second Circuit has not opined directly on the issue, a number of other Circuits, as well as other courts in this District, have found that "federal ha-

---

6. For this reason, Buari also fails to demonstrate that he was deprived of his right to an impartial jury by Jeffrey's nondisclosure of the relationship during voir dire. *See United States v. Shaoul*, 41 F.3d 811, 815–16 (2d Cir.1994) (observing that under the test set forth by the Supreme Court in *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984), a habeas petitioner must establish that a juror deliberately gave a false answer during voir dire).

beas relief is not available to redress alleged procedural defects in state post-conviction proceedings." *Jones v. Duncan,* 162 F.Supp.2d 204, 217–19 (S.D.N.Y.2001) (citation omitted); *see also Franza v. Stinson,* 58 F.Supp.2d 124, 151 (S.D.N.Y.1999) (holding that procedural defects in CPL § 440.10 proceedings are not cognizable on federal habeas review and collecting cases). Thus, Buari's claim that the Motion Court erred in failing to grant him an evidentiary hearing on his juror bias claim is likely not reviewable by this Court. Moreover, even if the claim were cognizable, it would fail because, as discussed above, Buari did not credibly allege juror misconduct. Additionally, it was not manifest error for the State Courts to find that Buari's delay of over seven years in filing his § 440 Motion juror bias claim, until after Jeffrey had passed away, was inexcusable. This is particularly the case in light of the evidence before the State Courts suggesting that Buari's mother and aunt recognized Jeffrey during trial, and that Schreiber, contrary to his own sworn testimony, may have been informed of the relationship before the verdict, as well.

Consequently, Buari's juror bias claim must fail.

### 3. *The New Evidence Claim*

■ Buari's second claim before the Court, that the State Courts' denial of his motion to vacate based upon Robinson's confession and Effort's recantation deprived him of due process, also lacks merit.

As a preliminary matter, Buari cites to no "clearly established" Supreme Court precedent in support of his argument. This failure, standing alone, is fatal to his claim. *See Taylor,* 529 U.S. at 412, 120 S.Ct. 1495. Nevertheless, even the cases to which Buari does cite provide no assistance. While *Sanders v. Sullivan* held that "a state's failure to act to cure a conviction founded on a credible recantation by an important and principal witness, exhibits sufficient state action to constitute a due process violation," 863 F.2d 218, 224 (2d Cir.1988), here, as discussed above, both the Motion Court and Appellate Division found that Robinson and Effort testified truthfully at trial and that their subsequent recantations (including Robinson's confession) were not credible. "[T]raditionally the recantation of testimony given on trial is looked upon with the utmost suspicion." *Sanders,* 863 F.2d at 225 (internal quotation marks omitted). Indeed, the Appellate Division observed that the evidence suggested that Robinson's confession was the result of coercion by Buari. A "determination of a factual issue made by a State court shall be presumed to be correct," 28 U.S.C. § 2254(e)(1), and the habeas petitioner bears a "heavy" burden in overcoming this presumption. *Carter v. Ercole,* 338 Fed.Appx. 43, 45 (2d Cir.2009). This is "particularly important when reviewing the [state] court's assessment of witness credibility." *Shabazz v. Artuz,* 336 F.3d 154, 161 (2d Cir.2003). Buari, who, in his Petition, essentially rehashes the same factual arguments he made before the Appellate Division, has not met his burden of rebutting the State Courts' findings by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Buari's reliance on *Ortega v. Duncan,* 333 F.3d 102 (2d Cir.2003), is equally unavailing, because in that case, the state court made no credibility finding, and the Second Circuit held that the district court erred in focusing on the credibility of a witness's recantation rather than on whether the witness testified truthfully at trial. *See id.* at 108. No such issues are presented here, since the State Courts explicitly found that Robinson's and Effort's trial testimony was truthful.[7]

---

**7.** Similarly, Buari's claim derives no support

from *Morales v. Portuondo,* 165 F.Supp.2d

#### 4. *The Giglio and Brady Claims*

■ Next, Buari argues that the prosecution violated his due process rights under *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) when it failed to correct witness Connor's "false" and "perjur[ed]" testimony and failed to disclose that Connor had a pending marijuana case. (Pet.'s Mem. at 68–70.)

"[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment.... The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) (internal citations omitted). However, as an initial matter, Buari misrepresents the Appellate Division's findings when he states that the court "correctly found that Jerry Connor committed perjury and that the prosecutor knew or should have known of the perjury." (Pet.'s Mem. at 68.) In reality, the Appellate Division never contradicted the Motion Court's finding that Connor's trial testimony "was completely truthful and not perjurious." *Buari*, 2006 WL 940640, at *15. Rather, the Appellate Division noted that the prosecutor failed to disclose the correct status of one of Connor's marijuana charges and failed to correct Connor's "mistaken" testimony. *Buari*, 50 A.D.3d at 485, 856 N.Y.S.2d 81. Buari points to no precedent, let alone well-established Supreme Court law, addressing truthful but mistaken—rather than perjured—testimony.[8] Indeed, there is some authority in this Circuit suggesting that a witness's mistaken testimony is not even "false" for purposes of determining whether the government was constitutionally required to "correct" it. *See Mills v. Scully*, 826 F.2d 1192, 1195–96 (2d Cir.1987) (*citing United States v. Petrillo*, 821 F.2d 85, 89 (2d Cir.1987) (holding that prosecutors had no duty to correct inaccurate and potentially misleading statements made by witness who may have misunderstood a grand jury proceeding about which she testified)); *see also United States v. Milikowsky*, 896 F.Supp. 1285, 1297–98 (D.Conn.1994). *But see United States v.*

---

601 (S.D.N.Y.2001) or *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). *Morales* involved a third-party confession made under "truly unique" circumstances that provided such "considerable assurances of reliability," that even the district attorney's office conceded that the petitioners' convictions should be vacated. 165 F.Supp.2d at 602, 610. And *Chambers*, in which the Supreme Court looked with disfavor upon Mississippi courts' application of certain state evidentiary rules in excluding exculpatory testimony, explicitly limited itself to the facts of that case and "establish [ed] no new principles of constitutional law." 410 U.S. at 302–03, 93 S.Ct. 1038.

**8.** Presumably recognizing this deficiency, Buari cites *ABF Freight System v. NLRB*, 510 U.S. 317, 114 S.Ct. 835, 127 L.Ed.2d 152 (1994) and·*Banks v. Dretke*, 540 U.S. 668, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004) for the proposition that "the prosecution's duty to correct a witness's testimony is not limited to situations where it is determined that the witness knowingly committed perjury." (Pet.'s Reply at 13–14.) Yet the issue in *ABF Freight System* was whether false testimony given before an administrative law judge in a labor relations dispute should bar an employee from winning reinstatement with back pay, not what the remedy should be for a failure to correct mistaken but non-perjurious testimony in a criminal trial; and, in any event, the witness in *ABF Freight System* was found to have given intentionally false testimony. *See* 510 U.S. at 323, 114 S.Ct. 835. Similarly, *Banks* involved a government witness who intentionally "misrepresented" and "responded untruthfully" regarding his role as a government informant. 540 U.S. at 694, 124 S.Ct. 1256. Consequently, neither of these cases speak to the situation at hand.

*Glover,* 588 F.2d 876, 879 (2d Cir.1978) ("Even if [the] testimony were not perjurious, but simply mistaken ... the government still would have a duty under the Fourteenth Amendment not knowingly to allow false testimony to go uncorrected."). The Court acknowledges that in the leading case, *Mills,* unlike here, the prosecutor "made no effort to exploit the inaccurate trial testimony ... through argument at summation." 826 F.2d at 1196.

 In any event, even where a conviction results from the prosecution's failure to correct false or perjured testimony—as opposed to a failure to correct mistaken testimony—the Fourteenth Amendment is not implicated unless it can be said that there was a reasonable likelihood that the testimony affected the judgment of the jury or that it may have had an effect on the outcome of the trial. *See Giglio,* 405 U.S. at 154, 92 S.Ct. 763; *Napue,* 360 U.S. at 271, 79 S.Ct. 1173. Here, both State Courts found that "there [was] no reasonable possibility that the nondisclosure affected the verdict, given the overwhelming evidence of [Buari's] guilt, and the nature of the pending charge." *Buari,* 50 A.D.3d at 485, 856 N.Y.S.2d 81; *see also Buari,* 2006 WL 940640, at *15. The Court is not persuaded that this determination by the State Courts was an unreasonable application of *Giglio* and *Napue,* or of the standard for non-disclosure of evidence under *Brady. See United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (finding that suppression of evidence does not violate the Constitution unless "there is a reasonable probability that, had the evidence been disclosed to the defense, the result would have been different.").

Preliminarily, the State Courts' "factual conclusions as to the effect of nondisclosure are ordinarily entitled to great weight." *United States v. Orena,* 145 F.3d 551, 557–58 (2d Cir.1998) (internal quotation marks omitted). Still, the Court must conduct its own independent examination in determining whether the suppressed evidence was material. *See id.* at 558 (internal quotation marks omitted). Although the test of materiality is whether the withheld evidence reasonably undermines confidence in the verdict, *see Kyles v. Whitley,* 514 U.S. 419, 434–35, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the existence of substantial evidence of guilt unrelated to the withheld impeachment evidence makes it significantly more difficult to argue that there is a reasonable probability that withheld evidence, if disclosed, would have resulted in a different verdict. *See Orena,* 145 F.3d at 558; *United States v. Zagari,* 111 F.3d 307, 321 (2d Cir.1997) (finding undisclosed impeachment evidence regarding government witness immaterial where testimony was corroborated by independent evidence); *United States v. Payne,* 63 F.3d 1200, 1210 (2d Cir.1995) ("[A] new trial is generally not required when the testimony of the witness [as to whom impeachment evidence has been withheld] is corroborated by other testimony." (internal quotation marks omitted)).

Here, the non-disclosed evidence, which would have shown, at most, that Connor was mistaken—not lying—when he testified that he had received only a ticket for marijuana possession, rather than a ticket that was still pending but regarding which Connor had not yet been arraigned, was not material to Connor's credibility as a witness or to the ultimate issue of whether Buari was guilty of murdering the Harris Brothers. This conclusion is particularly compelling in light of the multiple other witnesses who corroborated Connor's testimony and the "overwhelming evidence" of Buari's guilt found by the State Courts. *Buari,* 50 A.D.3d at 485, 856 N.Y.S.2d 81.

Consequently, Buari's *Giglio* and *Brady* claims are denied.

### 5. *Cumulative Error*

Finally, Buari argues that the cumulative effect of the various errors that he believes occurred in the state court proceedings entitles him to habeas relief, even where those alleged errors would not, individually, so entitle him. As the Court finds that the state courts committed no errors sufficient to warrant granting habeas relief, this claim is denied.

## III. *ORDER*

For the reasons stated above, it is hereby

**ORDERED** that the petition dated November 16, 2009 of petitioner Calvin Buari ("Buari") seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is DENIED.

As Buari has not made a substantial showing of a denial of a constitutional right, a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c); *Lucidore v. N.Y. State Div. of Parole,* 209 F.3d 107, 111–13 (2d Cir.2000).

The Clerk of Court is directed to terminate any-pending motions and to close this case.

**SO ORDERED.**